S. P. Scroggin, Appellant, v. Rufus Wood *et al.*, Appellees.

87   497
99   603
87   497
102  226

1. Sale of Stallion: INTERPRETATION OF CONTRACT. A stallion five years old was sold with a warranty that he would prove an average breeder, but it was agreed that he should not be regarded as fully tested until he should have been tried two years; also that the seller

should not be responsible on account of disease or accident to the horse after leaving his stable. *Held*, that if the horse was sound when sold, the contract imposed upon the purchaser the risk of his living for the two years required to make the test, and that, since the horse died in a little more than four months, the test necessary to show a breach of the warranty became impossible, and no liability therefor could be asserted.

2. ———: FRAUDULENT REPRESENTATIONS: SCIENTER. One who sells a stallion upon representations that he is sound and of pure Norman blood, is not liable for such representations, though false, unless he knows at the time that they are false; it is not enough that he does not know them to be true.

3. ———: WRITTEN CONTRACT: FALSE REPRESENTATIONS: EVIDENCE. It is not the law of this state that, where there is a written contract of sale, oral testimony is not admissible to prove false representations whereby the sale was consummated.

4. ———: FRAUDULENT REPRESENTATIONS: EVIDENCE. No action for fraud can be maintained upon a representation, made by the seller of a stallion, that he will not produce sorrel colts, as it is necessarily a mere matter of opinion.

*Appeal from Adair District Court.*—Hon. A. W. WILKINSON, Judge.

TUESDAY, JANUARY 31, 1893.

ACTION upon a promissory note. Trial by jury. There was a verdict and judgment for the defendants. The plaintiff appeals.—*Reversed.*

*Haddock & Culver*, for appellant.

*Grass & Storey*, for appellees.

ROTHROCK, J.—I. The note upon which the suit was brought is for the sum of five hundred and sixty-six dollars and sixty-six cents, dated April 5, 1888. It is payable to the defendant Rufus Wood, and signed by the defendants C. Shirey and C. A. Snyder. The note was indorsed by Wood to the plaintiff. It is not a

1. SALE of stallion: interpretation of contract.

negotiable instrument, and Shirey and Snyder made defense thereto the same as if there had been no indorsement.

The facts attending the execution of the note are as follows: Rufus Wood resides at Lexington, in the state of Illinois. He is an importer and breeder of Norman and Clyde horses. The defendants Shirey and Snyder reside at Fontanelle, in Adair county, in this state. On the fifth day of April, 1888, they went to Lexington, and bought a stallion· of Wood, for which they were to pay the sum of five hundred and sixty-six dollars and sixty-six cents in cash, and execute two promissory notes for five hundred and sixty-six dollars and sixty-six cents each. This action is founded upon one of said notes. There was a written agreement between the parties to the transaction, dated on the day that the bargain was made. There is some correspondence between the parties, which shows that the cash payment was not made until the eighteenth day of April, 1888, and the bill of sale was not signed until after that time. The stallion was actually delivered to Shirey and Snyder on the fifth day of April, 1888, and was at once shipped to Fontanelle. The details of the transaction were closed up by correspondence after that time.

The defendants set up two defenses against the notes. One of these defenses is that there was a breach of the warranty contained in the bill of sale or written agreement. That part of the written agreement of sale which contains the warranty is as follows:

"The parties of the first part [Wood] assume no responsibility on account of disease or accident to said horse after leaving their stable, but agree that if, with proper treatment and handling, said horse fails to prove an average breeder, they will refund the money paid for said horse, provided said horse is returned as sound, and in as good condition, as when sold by said

first parties. Said horse shall not be considered as having been fully tested until he shall have been kept by said second parties two years from the beginning of the first season he makes after this date. This guaranty shall be binding on the party of the first part only on express condition that the party of the second part strictly complies with all of his covenants hereinafter made. The receipt of the cash payment is hereby acknowledged. It is also agreed by the parties of the second part that in the event they sell, transfer, or dispose of said horse without the written consent of said first party, then said first party is released from all guaranties.

"RUFUS WOOD,
"C. SHIREY,
"C. A. SNYDER."

This was a warranty that the horse was an "average breeder." The defendants, by their answer, claim that the animal was not an average breeder; and as evidence of that fact they claim that from the day the horse arrived at Fontanelle until August 24, 1888, the horse served one hundred and thirteen mares, from which service there were but twenty-nine colts. It is claimed that this is not a compliance with the warranty. There is great conflict in the evidence as to whether it was proper care for the defendants to allow a stallion which was five years old to serve one hundred and thirteen mares at that time, and whether such service was so excessive as to reduce the number of colts below the average. The jury found that the horse was not an average breeder. This finding was based upon the service of the horse for one season. He died on the twenty-fourth day of August, 1888. He was kept at serving mares until the day before he died, and he ate his feed the night before.

It will be observed that the contract of sale provides that "said horse shall not be considered as having

been fully tested until he shall have been kept by said second party two years from the beginning of the season he makes after this date" (April 5, 1888). And there is the further provision: "The parties of the first part assume no responsibility on account of disease or accident to said horse after leaving their stable." There is some contention between the parties as to what this provision of the contract means. It evidently means that, if the horse should die from accident or disease after he was delivered to the defendants, they would be liable to pay the price agreed upon, unless he was not an "average breeder." But the question on this branch of the case is whether the defendants can be allowed to set up the breach of the warranty, because the time for testing the breeding qualities of the horse had not elapsed when he died. There is evidence, and it is quite positively asserted by a number of witnesses, that a single season with a stallion five years old is not at all a satisfactory test of his breeding qualities. Whether this be true or not was not at all material. The parties expressly agreed that two years should be allowed for testing the horse as a breeder. Under this stipulation, if he was sound when sold, the purchasers took the risk of his living for the two years required to make the test. The contract will bear no other construction. Parties must abide by the contracts they make.

II. The defense of fraud is founded upon certain representations which it is alleged Wood made to

2. ——: fraudulent representations: sci-enter.

Shirey and Snyder. These alleged representations are stated in the answer as follows: That the "said Rufus Wood falsely and fraudulently, and with the purpose and intent of deceiving the defendants, and inducing them to buy said horse, stated to them that said horse was a pure-bred, imported Norman horse; that said horse would get no sorrel colts; and that he was in every way

a sound, healthy, and vigorous horse; that said horse was in perfect condition, sound as a dollar, and without any defect of any kind." These allegations are followed by proper averments of the falsity of the representations, and of Wood's knowledge that they were false when he made them; and by an amendment to the answer defendants claim that Wood was liable for the false representations, if they were recklessly made, without knowing them to be true. The court did not adopt this view of the law of fraud by false representation, but charged the jury that the guilty knowledge or *scienter* must be shown. This was correct, and has been the law in this state, in actions at law, since the case of *Holmes v. Clark*, 10 Iowa, 423.

III. A claim is made by counsel for the appellant that, as there was a written contract of sale, the evidence as to fraudulent representation was not admissible, because the whole contract is expressed in the writing. This is not the law in this state. *Nixon v. Carson*, 38 Iowa, 338; *Rohrbacher v. Ware*, 37 Iowa, 85; *Mann v. Taylor*, 78 Iowa, 355.

3. ——: written contract: false representations: evidence.

IV. We now come to the question as to the materiality of these representations. It is a fundamental principle of the law that a party can not be held liable in fraud for making promises that he does not perform, or for assurance that certain events will transpire. The one is a mere unperformed promise, and the other mere matter of opinion. Wood was not liable for making the representation that the horse would not produce sorrel colts. That was a mere matter of opinion, of conjecture. It would have been a proper subject for a warranty, but an affirmation of that kind can not be held to be an actionable false representation. The representation that the animal was a pure-bred, imported Norman horse, was actionable, if false, and known to

4. ——: fraudulent representations: evidence.

be false by Wood when he made it.   The same may be said of the representation as to soundness and freedom from disease.   The evidence as to whether the representations were made is in conflict, but the jury might well have found with the defendants on this issue.   But there is not one word of competent evidence that Wood knew that the stallion was not a pure-bred, imported Norman horse.   It is conceded that he was imported into this country about six months before the contract of sale was made; and Wood sold him to the defendants upon a pedigree, and there is no evidence that Wood knew that the pedigree was not true.   And the evidence that Wood knew that the horse was unsound was based upon the merest conjecture.   It appears that he died of some disease of the stomach.   Wood testified that the horse was sound and healthy, so far as he knew, when he sold him.   The defendants seek to charge Wood with knowledge that the horse was unsound because he was soft, and had little endurance, when he was purchased.   There is no evidence that there was anything in his movements and actions that indicated that he was unsound.   On the contrary he served mares until the day before he died, and sometimes as often as twice a day, and he ate his feed the evening before he died.

There is one circumstance which tends very strongly to show that Wood should not be charged with knowledge that the horse was diseased.   It is the fact that, although defendants claim that the horse exhibited evidence of unsoundness on the way from Illinois to this state, yet it appears that, thirteen days after they took the horse into their possession, they made the cash payment of five hundred and sixty-six dollars and sixty-six cents.   This fact is established beyond all question.   The following is a copy of a letter written by the defendants to Wood on the eighteenth day of April, 1888:

"Fontanelle, Iowa. 4-18-1888.
"*Rufus Wood, Esq., Lexington, Ill.*

"Dear Sir: Inclosed find draft for $566.66, less $25 freight, cash payment on stallion. We also inclose bill of sale for you to sign and return to us, and on receipt of the same will send you a copy, together with the notes, as provided for in the inclosed bill of sale. By examining the one you sent out with C. A. Snyder for Shirey to sign, you will observe that you have the payments wrong,—cash payments and all. Besides, the bill of sale you sent out contains several provisions that were not in the contract, but were expressly provided against in the purchase. The inclosed bill of sale is written to comply strictly with the terms of the contract, as Mr. Hulbert says it was; and Mr. Shirey refuses to sign the one sent out, for the reasons above stated.             C. Shirey,
          "C. A. Snyder."

And the correspondence between the parties was not closed, and the note sent to Wood, until after the first day of May, 1888. If the horse had any disease that was open to observation, it surely would have manifested itself in from twenty to twenty-five days before the sale was closed by the giving of the note. The defendants seek to charge Wood with knowledge of the alleged unsoundness by testifying that he could not have owned and handled the horse without knowing that he was unsound. It is scarcely necessary to say that this is a mere conclusion of the witnesses, and not competent evidence.

We have discussed the material features of this appeal in a general way, and our conclusion is that the judgment must be reversed, because there was no evidence of fraud, and for the further reason that the jury should have been explicitly charged that there could be no breach of the warranty, because the time for testing the quality of the horse as a breeder had not elapsed.

The judgment of the district court is reversed.